# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Elaine E. Bucklo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 4314 | **DATE** | 3/25/2002 |
| **CASE TITLE** | Wafra Leasing Corp. vs. Prime Capital Corp., et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] KPMG's motion to dismiss (13-1) is granted as to Count VIII, and granted in part and denied in part as to Count IX. Motion to dismiss by Thomas Ehmann and Vern Landeck (32-1) is denied as moot as to Count IV and otherwise denied. Bischoff and B&S' motion to dismiss (46-1) is denied. Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 7 | |
| | No notices required. | | number of notices | **Document Number** |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | MAR 26 2002 | |
| | Docketing to mail notices. | | date docketed | |
| | Mail AO 450 form. | | | **81** |
| | Copy to judge/magistrate judge. | | 7/25/2002 | |
| | | | date mailed notice | |
| MPJ | courtroom deputy's initials | U.S. DISTRICT COURT CLERK 02 MAR 25 PM 5:19 | MPJ6 | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

DOCKETED

MAR 2 6 2002

WAFRA LEASING CORPORATION 1999-A-1,  )
)
        Plaintiff,  )
)
    v.  )
)
PRIME CAPITAL CORPORATION, PRIME  )
LEASING CORPORATION, PRIME FINANCE  )
CORPORATION 1999-A-1, PRIME FINANCE  )   No.  01 C 4314
CORPORATION 1999-A-2, KPMG LLP,  )
BISCHOFF & SWABOWSKI, LTD., MARK  )
BISCHOFF, JAMES FRIEDMAN, VERN  )
LANDECK, THOMAS EHMANN, WILLIAM  )
SMITHBURG and JOHN WALTER,  )
)
        Defendants.  )

## MEMORANDUM OPINION AND ORDER

Wafra Leasing Corporation ("Wafra") invested in a securitization of financial contracts by Prime Capital Corporation and Prime Leasing Corporation (collectively "Prime"), and its investment went bad. Wafra sued Prime and several of its officers and directors, as well as KPMG L.L.P., Prime's auditor, and Bischoff & Swabowski ("B&S"), its attorneys, for securities fraud under § 10(b) and § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5, and several state causes of action. The Prime defendants answered the complaint. KPMG, Mark Bischoff and B&S, and Thomas Ehmann and Vern Landeck move to dismiss Wafra's complaint. I grant the motions in part and deny them in part.



Prime is a specialty finance company that originated and serviced financial contracts including equipment leases, loans and installment purchase agreements. From 1993 to 1999, Prime securitized the financial contracts to raise capital. Wafra invested in the 1999 securitization.

For all of the securitizations, including the 1999 transaction, Prime formed special purpose vehicles ("SPVs"), to which it transferred the financial contracts, and the SPVs would issue and sell promissory notes to third parties using the financial contracts as collateral, with an agreement that Prime would continue to service the financial contracts. The securitizations also required that the proceeds of the financial contracts ("rent payments") be used to make payments of principal and interest on the notes issued by the SPVs. Under the securitization documents, Prime, as the servicer, was authorized to collect payments, and all rent payments were required to be deposited in a "lock-box" account, kept separate from Prime's funds, and turned over to the securitization trustee within two business days. Prime was required to instruct all payers on the financial contracts to make payments directly to the lock-box account, and if payments were misdirected to Prime, Prime was required to turn them over to the lock-box account within two business days. This procedure was described in the Private

Placement Memorandum ("PPM"). The money in the lock-box account was the property of the SPVs, not Prime, and was to be used for payment on the notes issued by the SPVs.

However, as early as 1997, according to the complaint, Prime was diverting and misappropriating rent payments belonging to the SPVs by holding the funds for more than two days and commingling the funds with its own. This resulted in shortfalls of money required to be deposited in the lock-box account for the benefit of the SPVs, so Prime allegedly kited misdirected funds from the next month's receipts to pay its investors, which created a shortfall for the next month as well. Wafra alleges that the diversion and misappropriation raises an inference that Prime was insolvent, and that it hid this fact from investors by kiting misdirected payments from the following month.

In May 1999, in the midst of this alleged scheme, Wafra invested in the 1999 securitization. Wafra alleges that Prime's financial stability was critical to its ability to service the contracts and ensure that investors received a full return on their investments. According to the complaint, Prime's financial failure could only lead to a breakdown of the servicing arrangement and a loss to the holders of notes issued by the SPVs. As of the closing on May 4, 1999, Prime's annual Form 10-K report for 1998 had not been filed, so Wafra relied on financial information from the 1997 10-K and on representations of Prime's financial health by various

of Prime's officers, the description of the securitization in the PPM, and on opinion and valuation letters from B&S and KPMG, respectively its attorneys and auditors. Nobody disclosed the diversion, misappropriation or kiting prior to the closing.

After the closing, however, certain "red flags" about Prime's financial condition surfaced. The delayed 1998 10-K was issued on May 28, 1999, and included an auditor's report by KPMG dated May 20, 1999--just sixteen days after the closing--in which KPMG stated that Prime had transferred several million dollars to the SPVs in 1999 that were required to have been transferred in 1998. In Prime's August 1999 second quarter quarterly report, Prime reported that it needed more capital to "meet its ongoing liquidity needs." In a July 1999 proxy statement, two and a half months after the closing, Prime disclosed that, in January 1999, more than three months before the closing, its president and CEO had made a loan of $900,000 to Prime. Prime announced in November 1999 that KPMG, its auditor of many years, had resigned, and that KPMG had brought to Prime's attention "the existence of certain irreconcilable differences between the account detail and the general ledger" relating to transactions in prior years, but that KPMG had not required an adjustment. Prime's third quarter report in November 1999 indicated that its liquidity problems had worsened. Despite its financial difficulties, Prime still continued to make the required monthly payments to Wafra.

4

In April 2000, the securitization trustee notified Prime that there had been several defaults under the indentures and servicing agreements. On June 9, 2000, Prime held a conference call in which Wafra's president participated. Prime's vice president disclosed that Prime had misappropriated funds from the securitization trusts and used some of those funds for its own purposes, and that it would be unable to continue servicing the financial contracts. Wafra says this is the first whiff it had of any wrongdoing. Prime defaulted on the principal payment due to Wafra on June 15, 2000, and, although Wafra continues to receive interest payments, Wafra has not received any principal payments from Prime since May 2000. Wafra claims that it has lost $3.4 million, plus interest and expenses, as a result of the defendants' alleged fraud.

## II.

On a motion to dismiss, I accept all well-pleaded factual allegations in the complaint as true and draw all inferences in favor of the non-moving party. *Johnson v. Rivera*, 272 F.3d 519, 520 (7th Cir. 2001). I may not dismiss a complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

Ordinarily, I may not consider facts outside of the complaint on a motion to dismiss, but there is a well-recognized exception: I may consider documents that are referred to in the plaintiff's

5

complaint and that are central to its claim without converting this motion to one for summary judgment. *See Menominee Indian Tribe of Wisc. v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998); *Help At Home Inc. v. Medical Capital, L.L.C.*, 260 F.3d 748, 752 (7th Cir. 2001). *But see Berthold Types Ltd. v. Adobe Systems Inc.*, 242 F.3d 772, 775 (7th Cir. 2001). In addition, a plaintiff is entitled to supplement its complaint with factual narration that is consistent with the complaint, and I may consider those additional facts for the purposes of this motion. *See Help At Home Inc.*, 260 F.3d at 752-53.

### III. Federal Claims

To state a claim under SEC Rule 10b-5, promulgated under § 10(b) of the Securities Exchange Act of 1934, "a plaintiff must allege that the defendant (1) made a misstatement or omission, (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, (5) upon which the plaintiff relied, and [that] (6) that reliance proximately caused plaintiff's injuries." *In re HealthCare Compare Corp. Secs. Litig.*, 75 F.3d 276, 280 (7th Cir. 1996). The allegations of the complaint must also comply with the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b).

All of the defendants argue that Wafra's federal securities claims are barred by the statute of limitations, and KPMG argues that certain claims against it are barred by the statute of repose.

The Officers and KPMG argue that Wafra's claims fail for a lack of justifiable reliance. The Officers and the Bischoff defendants also argue, for several independent reasons, that Wafra fails to state a claim for securities fraud.

## A. Statute of Limitations

Rule 10b-5 claims are governed by a one-year statute of limitations and a three-year statute of repose. *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 364 (1991). The one-year period:

> begins to run not when the fraud occurs, and not when the fraud is discovered, but when (often between the date of occurrence and the date of the discovery of the fraud) the plaintiff learns, or should have learned through the exercise of ordinary diligence in the protection of one's legal rights, enough facts to enable him by such further investigation as the facts would induce in a reasonable person to sue within a year.

*Fujisawa Pharm. Co., Ltd. v. Kapoor*, 115 F.3d 1332, 1334 (7th Cir. 1997). Whether a plaintiff had sufficient information to place it on inquiry notice is a question of fact, *Marks v. CDW Computer Ctrs., Inc.*, 122 F.3d 363, 367 (7th Cir. 1997), but "if a plaintiff pleads facts that show its suit barred by a statute of limitations, it may plead itself out of court under a Rule 12(b)(6) analysis." *Whirlpool Fin. Corp. v. GN Holdings, Inc.*, 67 F.3d 605, 608 (7th Cir. 1995).

Wafra filed the complaint in this case on June 8, 2001. The

moving defendants argue[1] that Wafra's securities fraud claim is barred by the statute of limitations. The defendants say that the clock started running as early as 1999, when Prime made public disclosures that indicated its financial distress. Wafra, however, argues that the time began to run only when it was first injured; *i.e.*, when Prime failed to make the securitization payment due on June 15, 2000; or at the earliest on June 9, 2000, when Prime disclosed its misappropriation and diversion to Wafra in a conference call.

Prime's poor financial condition was revealed by a series of public disclosures in 1999: the July 1999 proxy statement that disclosed a January 1999 (pre-closing) loan to Prime of nearly a million dollars from its CEO, Compl. ¶ 49; Prime's August 1999 quarterly report that stated that Prime would need more capital resources to meet its liquidity needs, *id.* ¶ 48; Prime's November 1999 announcement of the resignation of KPMG, its longtime auditors, in which Prime revealed some undefined accounting irregularities involving past transactions, *id.* ¶ 50; and the November 1999 quarterly report that indicated more serious liquidity problems, specifically Prime's inability to fund new

---

[1] Ehmann and Landeck's motion to dismiss, which raises the statute of limitations argument, is adopted by William Smithburg, John Walter, James Friedman, and by Bischoff and B&S. KPMG filed a separate motion to dismiss, also raising the statute of limitations.

financial contracts, *id.* ¶ 52.[2] The defendants say that these announcements contradicted Prime's alleged oral representations of financial health, so that there were "suspicious circumstances" that obligated Wafra to investigate further.

The complaint contains lengthy allegations about the failure to disclose information about Prime's finances, and the defendants ask me to infer therefore that the financial failure, and not the misappropriation, diversion and kiting scheme, was the essence of the fraud. However, in response to Ehmann and Landeck's motion to dismiss, Wafra explains that the lock-box account and the Indenture agreement, as well as the provision for a back-up servicer, were established to protect Wafra's interests in the event of Prime's financial failure, and that the only way that Wafra could be injured under the arrangement was from a compromise of the lock-box account. Resp. to Ehmann and Landeck's Mot. at 11-12; *see also* Resp. to KPMG's Mot. at 4 ("Wafra is not suing KPMG for failing to disclose any of [the] information" about Prime's deteriorating financial status.). According to Wafra, the fraud alleged is more than Prime's misrepresentation of its financial condition; it is

---

[2] The defendants also point to ¶ 54 of the complaint, which states that in April 2000, "the Trustee in the 1999-A Securitization[] provided notice to Prime Leasing of the existence of several events of default under the indentures and servicing agreements applicable to the 'Prime Trusts.'" Drawing all reasonable inferences in favor of Wafra, this paragraph speaks only to Prime's knowledge of the defaults, but says nothing about *Wafra's* notice of the situation.

also, and more importantly, the alleged kiting scheme (which Wafra says was designed specifically to prevent discovery of Prime's insolvency) that compromised the lock-box mechanism. Drawing all reasonable inferences in favor of Wafra at this stage, *see In re Healthcare*, 75 F.3d at 279, the complaint and Wafra's additional factual narration allege that, if Prime had properly handled its financial problems, the backup servicer would have prevented a loss to the investors, but because Prime diverted and misappropriated funds and hid that fact from investors through the kiting scheme, the lock-box arrangement failed and the investors lost money. Mere notice of Prime's failing finances was insufficient to give notice of the fraud without knowing that the funds from the lock-box account had been misappropriated.

Wafra suggests that it should not be charged with notice of the alleged fraud until its injury actually occurred, *i.e.*, until Prime failed to make the payment due on June 15, 2000, because it could not have sued without an injury, and that it was not injured until the monthly payments stopped. This theory has been conclusively rejected by the Seventh Circuit:

> Discovering that one has lost money is not the same as discovering that one has been defrauded. . . . [T]he question . . . is when the investors discovered (or should have discovered) the deceit, not when the full consequences of that deceit are felt. An investor can be defrauded before any loss is realized. Discovery of the fraud means the discovery of the misrepresentation.

*Eckstein v. Balcor Film Investors*, 8 F.3d 1121, 1127-28 (7th Cir.

1993) (citations omitted). Wafra may not have known until June 2000 that its investment was a *total* loss, but the relevant question is not when it appreciated the scope of its loss; rather, the question is when it had access to enough information to know that it had been knowingly lied to, which is all that inquiry notice requires. *See Law v. Medco Research, Inc.*, 113 F.3d 781, 786 (7th Cir. 1997) ("In a fraud case . . . [w]hen the plaintiff knows or should know [that the defendant knowingly made a false statement], the statute of limitations begins to run.").

Wafra alleges that it could not reasonably have discovered the existence of a possible fraud before Prime admitted to the fraud on June 9, 2000. Compl. ¶ 56. KPMG made the following statement in the consolidated financial statements attached to Prime's 1998 Form 10-K, which was filed sixteen days after the closing, on May 28, 1999:

> [Prime] acts as a servicer for each of its securitizations as well as its assets in various credit facilities. As servicer, [Prime] receives funds due its affiliated special purpose entities[, of which Wafra is one, *id.* ¶ 7]. These funds, *certain of which were required to be transferred to these entities in 1998 and were transferred in 1999,* are included in accrued expenses and other liabilities and totaled $6,742,681 and $3,563,195, at December 31, 1998 and 1997, respectively.

*Id.* ¶ 147(b) (emphasis added). Wafra alleges that this statement, which appeared in Note 4 to the financial statement:

> reveals that sometime prior to the filing of the 1998 10-K, KPMG certainly knew that as of December 31, 1997, Prime Capital had on hand $3,563,195 which consisted, in whole or in part, of diverted and misappropriated funds which were required to have been transferred to the SPVs in 1997 and which had not in fact been so transferred. That is, sometime prior to the filing of the 1998 10-K, KPMG certainly knew of

11

Prime Capital's Diversion and Misappropriation scheme and that this scheme went back at least as far as 1997.

*Id.* Wafra argues that KPMG's statement that the funds were transferred late was "intentionally opaque," "obscure" and "ambiguous" rather than "simple, plain language that a reasonable investor can understand." Resp. at 6-7 (citing *McCool v. Strata Oil Co.*, 972 F.2d 1452, 1463 (7th Cir. 1992)).

Note 4 says that payments that should have been transferred in 1998 were not transferred until 1999. Wafra alleges that any such "misdirected payments" were to be transferred to the lock-box account within two business days, Compl. ¶ 23, so a statement that more than $3.5 million (an amount slightly more than the loss claimed by Wafra here) in misdirected rent payments had not been properly deposited might have alerted investors to some accounting irregularities, or to the possibility that Prime had made some misleading assurances about the proper operation of the lock-box account. In a fraud case, however, a plaintiff needs to know more than just that the defendant made a false statement (or misleading omission) before the statute of limitations begins to run: a plaintiff needs to know "that the defendant has made a representation that was *knowingly* false." *Law*, 113 F.3d at 786 (emphasis in original). Mere suspicion is not enough, but "[s]uspicious circumstances, coupled with ease of discovering, without the use of legal process, whether the suspicion is well grounded, may cause the statute of limitations to start to run

before the plaintiffs discover the actual fraud." *Id.*

Wafra argues that there is nothing it could have done, without legal process, to discover that the failure to disclose the mishandled payments was knowing, much less to discover that Prime was diverting and kiting the funds. Under the agreement with Prime, Wafra says that it was entitled only to monthly statements showing the amounts of money collected and disbursed under the financial contracts and the amount to which Wafra was entitled under the Indenture, Compl. ¶ 45, and that, because of the kiting scheme, the monthly statements would not have revealed the misappropriation and diversion that is the essence of the fraud. Moreover, Wafra alleges that it had no access to Prime's books and records under the securitization because the securitization Trustee was interposed between the investors and Prime. Pl's Resp. to B&S's Motion at 8. Although "[i]nvestors are not entitled to nail down 'every last detail of a transaction' before they may be charged with knowledge sufficient to start the running of the limitations period," *Donohoe v. Consolidated Operating & Prod. Corp.*, 982 F.2d 1130, 1141 (7th Cir. 1992) (§ 13 context), the defendants have not demonstrated what information Wafra could have obtained prior to Prime's disclosure of the misappropriation and diversion that would have revealed even the general nature of the fraud. *See Law*, 113 F.3d at 786. If Wafra lacked notice of the fraud by Prime and the individual defendants, it could not have had notice of KPMG's or

B&S's alleged role in the coverup. The defendants have the burden of proving that the claims are time-barred, and they have not shown what Wafra possibly could have done before June 9, 2000, to discover the diversion, misappropriation and kiting scheme. Wafra's federal claims for securities fraud are not barred by the one-year statute of limitations.

## B. Statute of Repose

KPMG also argues that the three-year statute of repose bars any claims based on KPMG's 1997 Audit opinion, which was attached to Prime's 1997 10-K filing and provided to Wafra during negotiations. In *Lampf*, the Supreme Court held that an action under § 10(b) and Rule 10b-5 must be commenced within three years after the "violation." 501 U.S. at 364. KPMG issued the 1997 Audit on March 27, 1998, and Wafra filed the complaint on June 8, 2001, more than three years later, so the only question is when the alleged violation occurred for the purpose of the statute of repose: on the date of the alleged misrepresentation or on the date of the sale?

In *Lampf*, the Supreme Court held that the plaintiff's complaint was untimely because it "was filed more than three years after petitioner's alleged misrepresentations." *Id.* The Court also noted that, to the extent "that the various 1-and-3 periods contained in the 1934 and 1933 Acts differ slightly in terminology," the governing standard for Rule 10b-5 actions came from the language of § 9(e) of the 1934 Act, 15 U.S.C. 78i(e),

which refs to a "violation." *See id.* at 364 n.9. *Cf.* 15 U.S.C. §
78r(c) (statute of repose runs from date when "cause of action
accrued"); 15 U.S.C. § 77m (statute of repose runs from date of
"the sale"). I previously considered these portions of the *Lampf*
opinion, but concluded nevertheless that, because a "violation"
requires a purchase or sale of a security, the three-year statute
of repose runs from the date of the sale. *See Kleban v. S.Y.S.
Restaurant Mgmt., Inc.*, 912 F. Supp 361, 367 (N.D. Ill. 1995)
(Bucklo, J.). Wafra relies on *Kleban*, and on the Seventh Circuit's
opinions in *McCool v. Strata Oil Co.*, 972 F.2d 1452 (7th Cir.
1992),[3] and *Ferguson v. Roberts*, 11 F.3d 696 (7th Cir. 1993), in
support of its argument that the repose period does not begin until
the sale, when the cause of action accrues. *McCool* and *Ferguson*
were both decided under § 27A, 15 U.S.C. § 78aa-1, which required
application of pre-*Lampf* standards, and discussed state statutes,
so neither case is dispositive here.

The Seventh Circuit has not decided, since *Lampf*, what the
"triggering event" for the statute of repose in § 10(b) claims is,[4]

___

[3] Although I recently cited to *McCool* for the proposition that
a repose period runs from the date of sale, that case arose under
§ 15(a)(1), 29 U.S.C. § 78o(a)(1), which prohibits the sale of a
security unless a broker is registered with the SEC, not under Rule
10b-5. *Celsion Corp. v. Stearns Mgmt. Corp.*, 157 F. Supp. 2d 942,
949 (N.D. Ill. 2001).

[4] The Seventh Circuit has noted, in dictum, that a statute of
repose "runs from some fixed date such as the date on which the
security was purchased. E.g., 15 U.S.C. §§ 77m, 78i(e); Cal Corp.
Code § 25506." *J.E. Liss & Co. v. Levin*, 201 F.3d 848, 850 (7th

15

but there are cases on both sides of the debate. Since I decided *Kleban*, two judges in this district have held that the statute of repose begins to run with the misrepresentation. *See Stauffer v. Westmoreland Obstetric & Gynecologic Assocs., S.C.*, No. 00 C 1242, 2001 WL 585510, at *5 (N.D. Ill. May 25, 2001) (Moran, J.) (holding, without analysis, that claims based on misrepresentations made outside of the statute of repose were barred); *Antell v. Arthur Andersen LLP*, No. 97 C 3456, 1998 WL 245878, at *6 (N.D. Ill. May 4, 1998) (Andersen, J.) (same, with analysis); *see also In re the Prudential Ins. Co. of Am. Sales Practices Litig.*, 975 F. Supp. 584, 603-04 (D.N.J. 1997) (same, with analysis). Other cases, like my decision in *Kleban*, have equated a "violation" of Rule 10-b5 with the accrual of a cause of action. *See Otto v. Variable Annuity Life Ins. Co.*, 816 F. Supp. 458, 461 & n.3 (N.D. Ill. 1992) (Conlon, J.) (noting that "a violation of § 10(b) and Rule 10b-5 is comprised not only of a misrepresentation or omission of material facts, but also includes 'the purchase or sale of any security'").

In an intervening state tort case, the Seventh Circuit considered two different formulations of the distinction between statutes of repose and statutes of limitations, both of which considered the accrual of the cause of action as unrelated to the

Cir. 2000). Section 77m, the first section cited, specifies that the depose runs from "the sale." Both § 78i(e) and § 25506 refer to the "violation." I do not conclude from this dictum that the Seventh Circuit has conclusively held that the "violation" for the purposes of Rule 10b-5 occurs at the time of "the sale."

triggering event of a repose period. *Hinkle v. Henderson*, 85 F.3d 298, 301 (7th Cir. 1996). In a securities case pre-dating *Lampf*, the court held that "[a] period of limitation bars an action if the plaintiff does not file suit within a set period of time from the date on which the cause of action accrued. In contrast, a period of repose bars a suit a fixed number of years after an action by the defendant . . . , even if this period ends before the plaintiff suffers any injury." *Beard v. J.I. Case Co.*, 823 F.2d 1095, 1097 n.1 (7th Cir. 1987); *see also Kaplan v. Shure Bros., Inc.*, 153 F.3d 413, 422 (7th Cir. 1998) (applying Illinois law) ("As a general proposition . . . the time the action accrued is immaterial to the application of a statute of repose.").

The Ninth Circuit has also held that the repose period for Rule 10b-5 "begins to run . . . when a person commits the act that gives rise to liability under that section." *Asdar Group v. Pillsbury, Madison & Sutro*, 99 F.3d 289, 294-95 (9th Cir. 1996). It is the misrepresentation "in connection with the purchase or sale," not the sale itself, that violates Rule 10b-5. Thus it appears that a "violation" under Rule 10b-5 is distinct from the concept of a "cause of action" under that rule. A defendant who makes a knowingly false representation with the purpose of inducing a sale of securities violates Rule 10b-5 even if no purchaser is taken in by the lies and no purchase has actually occurred. That the cause of action has not accrued at that point is beside the point,

17

because the defendant has committed a fraudulent act. *See, e.g.,* *Eckstein*, 8 F.3d at 1128 ("Discovery of the fraud means the discovery of the misrepresentation.") (statute of limitations context). This distinction is particularly clear where, as here, the defendant accused of misrepresentation is not the seller; the last act committed *by KPMG* with regard to the fraudulent audit was its alleged misrepresentations.

In view of the Seventh Circuit's distinction between an act of the defendant that triggers the repose period and the accrual of the cause of action, and of the Ninth's Circuit's conclusion that it is the offending act itself that starts the repose clock, I reconsider my opinion in *Kleban* and hold that the "violation" for the purposes of the Rule 10b-5 statute of repose occurs when the defendant makes a misrepresentation in connection with the sale or purchase of securities; the sale itself need not have occurred to start the running of the repose period. This interpretation of "violation" for the purposes of the repose period is consistent with the Seventh Circuit's treatment of the statute of limitations, which runs from the date of the "facts constituting the violation": the statute begins to run when the plaintiff knows or should know that the defendant made a statement that is knowingly false. *Law*, 113 F.3d at 786; *Eckstein*, 8 F.3d at 1128; *see also Antell*, 1998 WL 245878, at *5 (holding that, to be consistent, "violation" must be construed same way for statute of repose and limitation). Here, the

alleged knowingly false representation occurred when KPMG issued the 1997 audit on March 27, 1998, outside the three-year repose period. The claims against KPMG based on the 1997 audit are barred.

## C. Reasonable Reliance

Ehmann and Landeck ("the Officers") and KPMG argue that the securities claims against each of them are barred because Wafra cannot demonstrate reasonable reliance. Justifiable or reasonable reliance, although often considered an independent element of a Rule 10b-5 cause of action, "is no more than the combination of a material misstatement (or omission) and causation." *Astor Chauffeured Limousine Co. v. Runnfeldt Inv. Corp.*, 910 F.2d 1540, 1546 (7th Cir. 1990).

### 1. The Officers

Wafra alleges that the PPM was misleading because it described the operation of the "Lock-Box" account and Prime's obligations with respect to misdirected payments, but failed to disclose the existence of the kiting scheme. Compl. ¶ 90. Wafra also alleges that it relied on oral statements by several of the Officers. The Officers argue that, as a matter of law, Wafra could not reasonably have relied on statements outside the PPM because of a non-reliance clause in the PPM, which states that "[n]o person has been authorized to give any information or to make any representations other than those contained in this [PPM] and, if given or made, such information or representations must not be relied upon." Def.

19

Ex. A at iv. They rely on *Rissman v. Rissman*, 213 F.3d 381 (7th Cir. 2000), which held that "a written anti-reliance clause precludes any claim of deceit by prior representations." *Id.* at 384. However, *Rissman* involved a stock-purchase agreement, in which the plaintiff had bargained for broader assurances, but had settled for an anti-reliance provision in a contract. *Id.* at 383. The court held that, where the plaintiff had signed a contract saying it would not rely on oral statements outside of the contract, "[s]ecurities law does not permit a party to a stock transaction to disavow such representations--to say, in effect, 'I lied when I told you I wasn't relying on your prior statements' and then to seek damages for their contents." *Id.* Here, however, the PPM was not a contract; it was merely an offer to sell the Notes, and there is no allegation or evidence to suggest that Wafra agreed to be bound by the anti-reliance provision of the PPM. *Rissman* does not apply here.

Moreover, the PPM, on its face, did not apply to the Owner Certificate;[5] it states that "[t]he Issuers also anticipate issuing

---

[5] The Officers seize on language from the complaint which says that the Owner Certificate was issued "pursuant to" the PPM, and say that Wafra cannot contradict the complaint now and say that the Owner Certificate was not subject to the non-reliance clause of the PPM. Paragraph 34 of the complaint says that the securitization documents for the 1999 securitization "are described in detail in the [PPM]" prepared by Merrill Lynch. Paragraph 36 says: "Pursuant to the PPM, the Issuers proceeded to sell three classes of notes . . . and one class of 'Owners Certificate.'" Drawing all inferences in favor of Wafra, as I must for the purposes of this motion, ¶ 36 simply says that, as described in the PPM, the Issuers sold the

the [Owner Certificate] which is not offered hereby." Def. Ex. A at ii. The disclaimer paragraph on which the Officers rely, which says that "this private placement memorandum does not constitute an offer to sell or a solicitation of an offer to buy any securities other than the notes," which are defined in the first paragraph of the PPM as the Class A, B and C Notes, but not the Owner Certificate. If the defendants were not bound by the PPM for transactions other than the solicitation and sale of the Notes, Wafra is not bound by the PPM's non-reliance clause for the solicitation and sale of the Owner Certificate.

Furthermore, in an analogous case, one court held that note issuers could not disclaim their own authority to make representations by stating that "[n]o dealer, salesperson or other person has been authorized [by the note issuer] . . . to give any information or to make any representation not contained in this Offering Memorandum." *Gabriel Capital, L.P. v. Natwest Fin., Inc.*, 94 F. Supp. 2d 491, 507 (S.D.N.Y. 2000). The Officers argue that *Gabriel Capital* is distinguishable because the disclaimer there was narrower than the disclaimer in the PPM, but that is not so. Both clauses state that "no person" has been authorized to make representations outside of the offering memorandum and that any such representations cannot be relied upon. Here Wafra claims to

---

Owner Certificate, and it is not inconsistent with Wafra's additional allegations.

have relied on statements by Prime and its agents, including Ehmann and Landeck. The question is whether Prime's agents can disclaim their *own* representations with such a disclaimer, and *Gabriel* says that they may not.

Even if the anti-reliance clause were applicable to the purchase of the Owner Certificate and barred reliance on prior oral statements, it would not preclude Wafra's reliance on the representations in the PPM itself, which Wafra alleges was misleading because it described the operation of the "Lock-Box" account and Prime's obligations with respect to misdirected payments, but failed to disclose the existence of the kiting scheme. Compl. ¶ 90. The Officers have not demonstrated that, as a matter of law, Wafra's reliance on their statements and on the PPM was unreasonable.

## 2. KPMG

At the May 4, 1999, closing, KPMG delivered a letter to Prime and its placement agent, Merrill Lynch & Co., which calculated the payments due under the securitized financial contracts. Compl. ¶ 148. In that letter, KPMG stated that:

> We were not engaged to perform an audit, the objective of which would be the expression of an opinion on the specified elements, accounts, or items. Accordingly, we do not express such an opinion. Had we performed additional procedures, other matters might have come to our attention that would have been reported to you.
> This report is intended solely for the use of the addressees [Prime and Merrill Lynch] and should not be used by those who have not agreed to the procedures taken and taken responsibility for the sufficiency of the procedures for their

purposes.

KPMG's Ex. A at 6. Wafra alleges that KPMG's representation that it has not "performed additional procedures" was knowingly false because it had already performed the procedures for the 1998 Audit, which was issued only sixteen days after the closing, and that the audit procedures disclosed the alleged kiting scheme. The kiting scheme, in turn, rendered the calculations and verifications in the letter misleading, because the projected income from the contracts was based on the "knowingly false assumption that no such [kiting scheme] existed." Compl. ¶ 152. Wafra alleges that it received the letter at the closing and relied on it in its investment decision; in essence, it says that it would not have invested if KPMG had disclosed the kiting scheme. *Id.* ¶ 154. KPMG argues that Wafra could not reasonably have relied on its May 4, 1999, letter because it contained "cautionary language" and because it was restricted to the use of the addressees, which included only Prime and Merrill Lynch.

Read liberally, the complaint alleges that the letter contained both a false statement (that no audit had been conducted) and an omission (the failure to mention the diversion, misappropriation and kiting scheme). Wafra does not explain how it could reasonably have relied on the statement that no audit had been conducted in making its investment decision; reliance on an auditor's statement that it had *not* conducted an audit as

23

confirmation that everything was okay with the transaction is both implausible and unreasonable. One can imagine an investor relying on an auditor's statement that it *had* conducted an audit and found nothing, but not on a statement that no audit had been conducted, and that the auditor could not say one way or another whether anything was wrong with the client's figures. Even assuming that KPMG's statement was false, what was there to rely on? The only way that Wafra could have relied on the statement that there had been no audit (and, implicit in that statement, that KPMG had not performed any "additional procedures") would be if Wafra believed that KPMG was lying, and that it really had done an audit and had found nothing questionable. Reliance on a statement of one whom one reasonably suspects of lying is unreasonable as a matter of law. *See Shaw Steel, Inc. v. Morris*, 240 B.R. 553, 558 (N.D. Ill. 1999) (Bucklo, J.) (bankruptcy context) ("The attitude of an ostrich is not one protected by the courts.").

The omission of any information that KPMG might have had about the misappropriation and kiting by Prime is really the heart of Wafra's claim about the letter, and the claim fails for reasons other than justifiable reliance. Wafra alleges that, by delivering the letter at the closing, KPMG chose to speak, and in doing so assumed the duty to speak the truth about material issues. *See Ackerman v. Schwartz*, 947 F.2d 841, 846 (7th Cir. 1991) ("Federal law requires persons to tell the truth about material issues once

they commence speaking . . . ."). But Rule 10b–5 makes it unlawful for any person to "make any untrue statement of a material fact *or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading*." (emphasis added). The highlighted portion demonstrates that a defendant is liable only for those omissions that make his *own* statements misleading. Here KPMG specifically disclaimed any opinion about the truth or reliability of the information provided by Prime; it said that it had not performed any procedures to verify the information in the schedules provided by Prime. KPMG's Ex. A at 3. Wafra does not point to any specific statement by KPMG in the letter that was rendered misleading, in light of its disclaimer of opinion, by KPMG's failure to disclose the kiting scheme. The mathematic procedures performed by KPMG were subject to the express qualification that KPMG had not verified the information provided by Prime. Wafra apparently alleges that the 1998 audit violated Rule 10b–5 because it recklessly turned a blind eye to Prime's alleged diversion, misappropriation and kiting, Compl. ¶ 147, but that audit cannot form the basis of a claim here because it was issued after the closing. *See Latigo Ventures v. Laventhol & Horwath*, 876 F.2d 1322, 1326 (7th Cir. 1989) (Misrepresentation that post-dates sale cannot form basis of Rule 10b–5 claim.).

To the extent that Wafra may be understood to argue that

25

KPMG's silence about the kiting scheme violated Rules 10b-5 because it had a duty to blow the whistle on Prime, it has not established that an auditor has any such duty. The duty to speak in the context of a Rule 10b-5 claim comes from state law, *Ackerman*, 947 F.2d at 846, and Illinois does not recognize an independent duty of an auditor to reveal the misleading nature of its client's statements. *See DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir. 1990) ("Although accountants must exercise care in giving opinions on the accuracy and adequacy of firms' financial statements, they owe no broader duty to search and sing."). Because Wafra fails to state a Rule 10b-5 claim against KPMG for either the 1997 audit or the May 4, 1999, letter, I need not consider whether it adequately pleaded scienter.

### D. "Bootstrapping"

The Officers characterize Wafra's claim as one for breach of the Indenture, which they argue cannot be "bootstrapped" onto a securities fraud claim under Rule 10b-5. In order to demonstrate the element of deception required by Rule 10b-5, the cause of action must be one based on "the omission or misrepresentation of a material fact, [not] merely . . . a claim for breach of a state law duty." *Panter v. Marshall Field & Co.*, 646 F.2d 271, 288 (7th Cir. 1981). In *Panter*, the court held that the plaintiff's claims of the failure to disclose corporate mismanagement and self-dealing amounted to "no more than [an] attempt to dress up a claim for

breach of fiduciary duty by alleging a failure to disclose a motive to act contrary to shareholders' interests." *Id.* at 291. *Panter* held that breach of a state duty, which presumably includes contractual as well as fiduciary duties, or the failure to disclose the breach of the duty is not actionable under Rule 10b-5 unless it is also "manipulati[ve] or decepti[ve]" within the meaning of § 10(b), 15 U.S.C. § 78(j). *Id.* at 288.

State law remedies and relief under Rule 10b-5 are not mutually exclusive. *See Fry v. UAL Corp.*, 895 F. Supp. 1018, 1043 (N.D. Ill. 1995) (Castillo, J.) ("[T]he mere fact that the conduct complained of involves a breach of fiduciary duty does not, alone, preclude a cognizable claim under the federal securities laws."); *see also DeLeo v. Swirsky*, No. 00 C 6917, 2001 WL 687458 (N.D. Ill. June 19, 2001) (Andersen, J.) ("A plaintiff may bring a cause of action under both state law and Section 10(b)."). Here Wafra alleges not only that Prime breached the Indenture agreement by compromising the lock-box mechanism through the kiting scheme, but also that it used the kiting scheme to conceal its insolvency from investors, Compl. ¶ 33, and that the PPM's description of the lock-box mechanism and Ehmann's assurances on December 11, 1998, that Prime would continue to be able to fund its flow of monthly securitization payment were misleading because of the failure to disclose the existence of the kiting scheme. These are sufficient allegations of "manipulative or deceptive" conduct to bring Wafra's

27

claim under the ambit of Rule 10b-5. *See Fry*, 895 F. Supp. at 1043-44.

### E. "Control Person" Liability

Ehmann asks to be dismissed from this case because he claims he was not a "control person" for the purposes of § 20(a) at the time of the alleged Rule 10b-5 violation, but his claim directly contradicts the allegations of Wafra's complaint. *See* Compl. ¶ 16 ("At all times relevant to this complaint, Defendant Thomas Ehmann . . . was Vice President, Finance . . . [and] a 'control person' of Prime Capital . . . ."). Ehmann says that he resigned from his position as an officer Prime on December 21, 1998, and he asks me to take judicial notice of Prime's April 30, 1998, and June 17, 1999, proxy statements filed with the SEC.[6] The 1998 proxy statement lists Ehmann as an officer, and the 1999 statement does not; Ehmann offers this as evidence that he ceased to be an officer and became a mere employee in December 1998. However, the proxy statements do not actually state when Ehmann resigned the vice presidency; drawing all inferences in favor of Wafra, as I must for the purposes of this motion, the most they show is that Ehmann was not an officer as of June 17, 1999, after all of the relevant allegations in the complaint.

---

[6] Under Fed. R. Evid. 201(d), I must take judicial notice if requested by a party and supplied with the necessary information. The proxy statements are public records, so I may consider them without converting the motion to one for summary judgment. *Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994).

Nevertheless, even if, counterfactually, the proxy statements showed that Ehmann was not an officer or a member as of the "control group" as of December 21, 1998, Ehmann may not be excused from the complaint on that basis. "Control-person" liability for a Rule 10b-5 violation exists under § 20(a) if the individual defendant (1) "actually participated in, that is, exercised control over the operations of" the violating entity, and (2) "possessed the power or ability to control the specific transaction" on which the Rule 10b-5 violation is predicated. *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992). Ehmann claims that he was not a control person when the alleged fraud occurred because he was not an officer when Prime defaulted on its payments to Wafra in June 2000. However, Wafra alleges that the kiting scheme began in or before 1997, long before Ehmann says he resigned his position as an officer. Moreover, Wafra says that Ehmann made statements on December 11, 1998, ten days before Ehmann says he resigned, about Prime's ability to meet its obligations to investors that were materially misleading because of Ehmann's knowledge of the kiting scheme. Compl. ¶ 80-81. This is sufficient to state a claim for control-person liability based on Ehmann's own actual participation in the alleged scheme.

### F. The Bischoff Defendants

Mark Bischoff was a member of Prime's Board of Directors, Secretary of the Board, outside counsel, and a large shareholder in

Prime. Compl. ¶ 13. He was also the senior and managing partner of B&S, which acted as Prime's general counsel, *id.*, and which issued an opinion letter to Wafra an others in connection with the closing on May 4, 1999, *id.* ¶ 87.

Bischoff argues that he is not personally liable because he did no more than draft an opinion letter in his capacity as an agent of B&S. However, the complaint also alleges that Bischoff, as a director, officer and major shareholder of Prime, knew of and directed the kiting scheme, and was a "controlling person," liable under § 20(a) of the 1934 Act for Prime's violations. *See Harrison*, 974 F.2d at 881. Wafra has adequately stated a claim against Bischoff individually for his direct participation in the alleged fraud in addition to the claim against B&S based on the opinion letter.

B&S argues that the Rule 10b-5 claims against it should be dismissed "because those claims are largely dependent upon allegations of omission and opinions about Prime's anticipated future conduct." B&S Mem. at 3. The two cases that it cites in support of this proposition have nothing to do with this argument and are irrelevant. *See Rissman*, 213 F.3d at 383-84 (discussing effect of anti-reliance provision in a stock purchase agreement); *Panter*, 646 F.2d at 288 (holding that mere claim for breach of state law fiduciary duty, without allegation of fraudulent misrepresentation or omission, does not state claim for violation

30

of Rule 10b-5).[7] Moreover, as a factual matter, B&S mischaracterizes the claim. Wafra's claims against B&S are based, at least in part, on the statement in B&S's opinion letter, addressed to Wafra and other investors, that:

> no information has come to our attention which would give us actual knowledge or actual notice [that] any . . . of the foregoing documents, certificates, reports and information on which we have relied are not accurate and complete.

Compl. ¶ 88. Landeck's officer's certificate, which was attached to the opinion letter, stated that Landeck was unaware of anything that would make statements in the PPM untrue or misleading. *Id.* ¶ 89. Wafra alleges that both Landeck and Bischoff knew that the PPM was false or misleading because it described the operation of the lock-box account without disclosing the diversion and misappropriation scheme. *Id.* ¶ 90. Thus, Wafra alleges, Bischoff and B&S knew that Landeck's statement in the officer's certificate was inaccurate, so the opinion letter was misleading. This claim is based neither on omissions nor on future conduct by Prime.

B&S argues that Wafra could not reasonably have relied on its opinion letter because it stated that the opinion was based facts supplied by Prime and that it had assumed that all representations in the documents from Prime were true. *See Harden v. Raffensperger, Hughes & Co, Inc.,* 65 F.3d 1392, 1404 (7th Cir. 1995)

---

[7] To the extent that I understand B&S to advance the same arguments under these cases that were advanced by the Officers, I reject them for the reasons stated above.

("[C]autionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law."). However, the letter also said that B&S claimed not to have any information that would disabuse it of the assumption that Prime's information was true and accurate, and Wafra alleges that it did. Compl. ¶ 90. The so-called "bespeaks caution" doctrine, which denies liability for predictions or opinions if the speaker includes sufficient cautionary language tailored to the risk involved, *see Rubinstein v. Collins*, 20 F.3d 160, 167 & n.21 (5th Cir. 1994) (describing evolution of doctrine), does not, as a matter of law, insulate misrepresentations of "hard facts" from liability. *See Harden*, 65 F.3d at 1406. Here the alleged misrepresentation was not a prediction or a mere opinion, but a misrepresentation of a "hard fact": that B&S knew of nothing that would make Prime's statements misleading. The "bespeaks caution" doctrine does not apply here.

B&S also invokes the particularity requirements of Fed. R. Civ. P. 9(b) and the PSLRA, 15 U.S.C. 78u-4(b). Rule 9(b) "requires the plaintiff to state 'with particularity' any 'circumstances constituting fraud.' . . . This means the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo*, 901 F.2d at 627. B&S argues that Wafra's allegations that there is a "strong inference" of fraud fail because Wafra does not allege the facts from which such an inference can be drawn. However, it points

32

only to paragraph 73, which contains allegations against Prime and Landeck, and not to any of the allegations against Bischoff and B&S, which say that B&S, at the direction of and through the actions of Bischoff ("who"), issued the May 4, 1999, opinion letter by B&S ("when" and "what") at the closing ("where"), and that Bischoff knew of the diversion and kiting scheme, so Bischoff and B&S knew that the PPM, on which they knew Wafra would rely, was false and misleading, but they said that they were not aware of anything that would suggests that Prime's documents were misleading ("how"). Compl. ¶¶ 84, 87-94. This satisfies Rule 9(b).

The PSLRA adds pleading requirements, in addition to those in Rule 9(b), for securities fraud actions. Bischoff and B&S do not identify how the allegations fail to comply with § 78u-4(b), so they have waived any argument on that basis. *See Commodity Futures Trading Comm'n v. Tokheim*, 153 F.3d 474, 476 n.3 (7th Cir. 1998) (Perfunctory and undeveloped arguments are waived.). To the extent that I understand their argument to be that Wafra failed to "state with particularity facts giving rise to a strong inference that the defendant acted with [scienter]," the complaint alleges that Landeck told Wafra's president that Bischoff, in his position as an officer of Prime, "was aware of and controlled" the diversion and misappropriation scheme. Compl. ¶ 62. This is sufficient to allege that Bischoff's and B&S's statement that they were aware of nothing that would suggest that Prime's documents were inaccurate or

33

incomplete was knowing, or at least reckless. The federal claims against Bischoff and B&S stand.

## IV. State Law Claims

### A. Individual Defendants

The Officers argue that, because there are no viable federal claims, I lack supplemental jurisdiction over the state law claims against them.[8] Bischoff and B&S join this argument. However, I have held that the federal claims against the Officers, Bischoff and B&S survive the motion to dismiss. In any event, Wafra has also pleaded subject matter jurisdiction based on 28 U.S.C. § 1332. Compl. ¶ 20. Wafra is a Cayman Islands Corporation with its principal place of business in the Cayman Islands. *Id.* ¶ 7. The defendants are all alleged to be domiciliaries of Illinois or New York. *Id.* ¶¶ 8-18. Section 1332(a)(2) confers subject matter jurisdiction in actions between "citizens of a State and citizens of a foreign state," so I have jurisdiction over this suit by a foreign corporation against citizens of New York and Illinois. 14A *Wright Miller & Cooper: Federal Practice & Procedure* § 3661, at 133-34 (3d ed. 1998). The only other arguments that the Officers made in support of dismissal of the state law claims against them were raised in reply, and are therefore waived for the purposes of this motion. *See United States*

___

[8] The First Amended Complaint, filed on January 15, 2002, drops the negligent misrepresentation claim in Count IV against Friedman, Landeck and Ehmann. The amended complaint also adds Count X, a claim against all defendants under the Illinois Consumer Fraud Act, which is the subject of a separately filed motion to dismiss.

*v. Matchopatow*, 259 F.3d 847, 851 (7th Cir. 2001).

## B. KPMG

The Illinois Public Accounting Act, 225 ILCS § 450/30.1 (the "Accounting Act"), limits the liability of public accountants to persons in privity of contract, except for:

> (1) such acts, omissions, decisions or conduct that constitute fraud or intentional misrepresentations, or
>
> (2) such other acts, omissions, decisions or conduct, if such person, partnership or corporation was aware that a primary intent of the client was for the professional services to benefit or influence the particular person bringing the action; provided, however, for the purposes of this subparagraph (2), if such person, partnership or corporation (i) identifies in writing to the client those persons who are intended to rely on the services, and (ii) sends a copy of such writing or similar statement to those persons identified in the writing or statement, then such person, partnership or corporation or any of its employees, partners, members, officers or shareholders may be held liable only to such persons intended to so rely, in addition to those persons in privity of contract with such person, partnership or corporation.

*Id.* Several courts in this district have interpreted the "provided, however" clause of paragraph (2) as a condition of liability, which means that an accountant is not liable *unless* there is a writing giving notice to the third party that the third party may rely on the accountant's representations. *Robin v. Falbo*, No. 91 C 2894, 1992 WL 188429, at *9 (N.D. Ill. July 24, 1992) (Holderman, J.) (relying on legislative debates); *see also Endo v. Albertine*, 812 F. Supp. 1479, 1495-96 (N.D. Ill. 1993) (Alesia, J.) (following *Robin*); *Dougherty v. Zimbler*, 922 F. Supp. 110, 116 (N.D. Ill. 1996) (Castillo, J.) (same).

However, the Illinois Appellate Court has since rejected the interpretation and approach of *Robin*. *Chestnut Corp. v. Pestine, Brinati, Gamer, Ltd.*, 667 N.E.2d 543, 546-47 (Ill. App. Ct. 1996), *appeal denied*, 671 N.E.2d 727 (Ill. 1996) (finding that resort to legislative history was unnecessary because the legislative intent was clear from the plain language of the statute). *Chestnut* holds that the second clause of paragraph (2) applies only when the accountant writes a letter; when, as here, there is no writing, a plaintiff may state a claim against the accountant by "show[ing] the intent of the client [that the plaintiff rely on the accountant's representations] and knowledge of the accountant of that intent." *Id.* at 547. The Illinois Supreme Court has not decided this issue, and KPMG argues that the *Robin* interpretation is more reasonable, but intervening "decisions of the state appellate courts control, unless there are persuasive indications that the state supreme court would decide the issue differently." *Lexington Ins. Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087, 1090 (7th Cir. 1999). The Illinois Supreme Court has recently reaffirmed that where "the language of [the statute] is unambiguous, it [is] improvident for the appellate court to look beyond the language of the statute to the legislative history," *Petersen v. Wallach*, -- N.E.2d --, No. 89947, 2002 WL 93108, at *4 (Ill. Jan. 25, 2002) (slip op.), *accord Chestnut*, 667 N.E.2d at 546-47, so there is no indication that it would reject the *Chestnut* court's

36

interpretation.

KPMG argues that, even if *Chestnut* applies, and I hold that it does, KPMG cannot be liable because, as to the 1997 audit, there are no allegations that KPMG was aware that a primary intent of Prime was that KPMG's services benefit Wafra, and as to the May 4, 1999 Valuation Letter, the letter expressly limited the parties who could rely on the letter and specifically excluded "those who have not agreed to the procedures and taken responsibility for the sufficiency of the procedures for their purposes." KPMG's Ex. A at 6. The May 4, 1999, valuation letter, addressed to Prime Leasing, Prime Financial, and Merrill Lynch, states that: "[t]his report is intended solely for the use of the addressees and should not be used by those who have not agreed to the procedures and taken responsibility for the sufficiency of the procedures for their purposes." KPMG Ex. A at 6. Wafra argues that "[g]iven that KPMG knew that Wafra intended to rely on the letter, it follows that KPMG knew that Wafra did agree to and take responsibility for the sufficiency of the procedures." Resp. at 24. However, the letter states that the addressees agreed to and took responsibility for the procedures, and says nothing about Wafra, so no reasonable reading of the letter shows that Wafra was intended to rely on it. Under the plain language of § 30.1, KPMG limited its liability for the May 4, 1999, letter to the addressees, and Wafra cannot state a claim for negligent misrepresentation on this basis.

KPMG issued the 1997 audit on March 27, 1998, Compl. ¶ 132, six months before Prime approached Wafra about investing in the 1999 securitization, *id.* ¶ 69. KPMG may be liable under the Accounting Act only if it knew that it was a primary intent of Prime that "the particular person bringing the action" benefit from KPMG's services. KPMG argues that, because it did not know of Wafra's intent to invest when it prepared the 1997 Audit, it cannot be liable. But the Accounting Act is silent about *when* the accountant must know of the client's intent for the plaintiff to rely on the accountant's work. The Illinois Appellate court has held that, when an accountant prepares an audit for its client's benefit and is unaware of any particular investor that may rely on the audit, the accountant may nevertheless be liable to third-party investors for statements in the audit if it discovers later that its audit was furnished to investors and if it verified the audit's accuracy to the particular plaintiff at that time. *Brumley v. Touche, Ross & Co.*, 487 N.E.2d 641, 644-45 (Ill. App. Ct. 1985). Although *Brumley* was decided before the enactment of the Accounting Act, "[a] legislative intent to abrogate the common law must be clearly and plainly expressed, and such an intent will not be presumed from ambiguous or doubtful language." *Maksimovic v. Tsogalis*, 687 N.E.2d 21, 24 (Ill. 1997). Because the Accounting Act does not specifically say that an accountant must know of its client's intent at the time it provides its services, I do not read

the Act to alter the rule stated in *Brumley*. Thus Wafra's allegations that KPMG knew before the closing that Prime provided its 1997 10-K (which included KPMG's 1997 Audit) to Wafra, and that Wafra was relying on it, Compl. ¶¶ 70, 147(d), 164, are sufficient to withstand a motion to dismiss. The motion to dismiss Count IX is granted as to the claims based on the May 4, 1999, letter, but denied as to the claims based on the 1997 audit.

### C. Bischoff and B&S

Wafra brings fraud and negligence claims based on B&S's May 4, 1999, opinion letter, addressed to Wafra, in which B&S stated that it had no information that would make any of the closing documents inaccurate or incomplete. Compl. ¶ 88. The only objection to the fraud claim is that, like the Rule 10b-5 claim, it was pleaded with insufficient particularity, and I reject that argument for the reasons stated above.

For an attorney to be liable to a third party for negligent misrepresentation, the plaintiff must prove "that the intent of the client to benefit the nonclient third party was the primary or direct purpose of the transaction or relationship." *Pelham v. Griesheimer*, 440 N.E.2d 96, 99 (Ill. 1982). Bischoff and B&S argue that Wafra cannot establish the existence of a duty, and that even if it could, it should not be liable for its May 4, 1999, opinion letter because it was merely an opinion. One Illinois court has stated, in a case against a real estate broker, that "[o]rdinarily,

39

the material facts upon which misrepresentation cases rest must be a past or existing fact rather than an opinion or promise of future action," *Buzzard v. Bolger*, 453 N.E.2d 1129, 1131 (Ill. App. Ct. 1983), but another court, on facts similar to this case, has held more recently that an attorney's opinion letter in a stock purchase transaction could be the basis of a negligent misrepresentation claim. *Geaslen v. Berkson, Gorov & Levin, Ltd.*, 581 N.E.2d 138, 142 (Ill. App. Ct. 1991) (Duty to nonclient plaintiff existed where opinion letter was addressed to plaintiff.), *partially rev'd on other grounds*, 613 N.E.2d 702 (Ill. 1993).

Bischoff and B&S rely on *Peaceful Family Limited Partnership v. Van Hedge Fund Advisors, Inc.*, No. 98 C 1539, 1999 U.S. Dist. LEXIS 1838 (N.D. Ill. Feb. 17, 1999) (Schenkier, M.J.) for the proposition that a law firm is not liable to third parties for misrepresentations made in the course of providing legal services to its clients. *Id.* at *25-26. There the letter on which the plaintiffs sued was directed to the client, not the plaintiffs, *id.* at *8, *26, but here B&S's opinion letter was addressed to Wafra, Compl. ¶ 88. In *Geaslen*, the court held that, although the primary purpose of the defendant-law firm's relationship with its client was to protect the client's interest, an opinion letter issued to third parties as the direction of the client was intended to benefit the third parties, and the law firm assumed a duty of due care toward the third parties with respect to the accuracy of the

contents of the letter. 581 N.E.2d at 142. Wafra therefore states a claim against Bischoff and B&S for negligent misrepresentation on the basis of the opinion letter.

## V. Conclusion

KPMG's motion to dismiss is GRANTED as to Count VIII, and GRANTED IN PART and DENIED IN PART as to Count IX. The officers' motion is DENIED as moot as to Count IV and otherwise DENIED. Bischoff and B&S's motion is DENIED.

ENTER ORDER:

_____
**Elaine E. Bucklo**
United States District Judge

Dated:    March 25, 2002

41